UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------X
DOUGLAS WELCH,

        Plaintiff,

     - against –

ROBERTO AYALA, THE TRUSTEES OF
COLUMBIA UNIVERSITY, THE
TRUSTEES OF COLUMBIA UNIVERSITY
IN THE CITY OF NEW YORK,

       Defendants.

------------------------------X

**MEMORANDUM AND ORDER**

19 Civ. 3455 (NRB)

**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**

Plaintiff Douglas Welch ("Welch" or "plaintiff") commenced this action on April 18, 2019 to recover damages for personal injuries he purportedly sustained in a motor vehicle accident. See ECF No. 1 (the "Complaint" or "Compl."). Before the Court is a motion for summary judgment brought by defendants Roberto Ayala ("Ayala"), a Columbia University Security Officer whose car struck plaintiff's vehicle; The Trustees of Columbia University; and the Trustees of Columbia University in the City of New York (collectively "defendants"). See ECF No. 41.

Defendants argue that they are entitled to summary judgment, because under New York's No-Fault Insurance Law: (i) Ayala did not cause plaintiff's claimed injuries; and (ii) plaintiff did not

sustain "serious injuries."[1]  <u>See</u> ECF No. 41; ECF No. 42, Memorandum of Law in Support of Defendants' Motion for Summary Judgment ("Defs. Br."); ECF No. 48, Reply Memorandum in Support of Defendants' Motion for Summary Judgment ("Defs. Reply Br.").  By contrast, plaintiff counters that defendants failed to meet their <u>prima facie</u> burden with respect to causation and the seriousness of plaintiff's injuries, and that, in any event, there are triable issues of fact regarding both issues.  <u>See</u> ECF No. 45, Plaintiff's Memorandum of Law in Opposition to Defendants' Motion to Dismiss ("Pl. Opp."); <u>see also</u> ECF No. 46, Plaintiff's Response in Opposition to Defendants' Motion ("Plaintiff's Response" or "Pl. Response").  Having carefully reviewed the record, and for the reasons discussed herein, the Court grants defendants' motion for summary judgment.

---

[1] In 1973, the New York State Legislature enacted the Comprehensive Motor Vehicle Reparations Act (<u>i.e.</u>, New York's "No-Fault Law") to promote prompt resolution of vehicular injury claims while alleviating unnecessary burdens on courts. <u>See</u> <u>Abdulazeez v. Depazarce</u>, No. 17-cv-7415, 2020 WL 104990, at *1 n.1 (S.D.N.Y. Jan. 9, 2020).  Pursuant to the No-Fault Law, automobile owners are required to purchase automobile insurance and automobile insurers, in turn, are required to compensate the insured for up to $50,000 in losses caused by the use or operation of a motor vehicle in New York state, regardless of fault.  <u>Id.</u>  Only claimants who have suffered a "serious injury" within the meaning of the No-Fault Law are permitted to file claims for personal injury losses that exceed the $50,000 threshold.  <u>See</u> N.Y. Ins. Law §§ 5101-5109.

**BACKGROUND**[2]

## I.   The Accident

On June 24, 2017, Welch and Ayala and were involved in a motor vehicle accident around 5:25 A.M. while Ayala was on routine mobile patrol heading northbound on Old Broadway towards West 133rd Street.  Pl. 56.1 ¶ 1.

The parties dispute the circumstances of the accident, though as discussed _infra_, those circumstances are not, in fact, truly subject to dispute.  Plaintiff asserts in his 56.1 Counter Statement that he was standing outside of the driver-side door of his vehicle when the edge of his driver's side door was struck by Ayala's patrol vehicle.  Pl. 56.1 ¶¶ 3, 6.  The impact allegedly

---

[2] The following facts are drawn from Defendants' Rule 56.1 Statement submitted on September 19, 2022 ("Defs. 56.1" or the "56.1 Statement"), ECF No. 44; Welch's Counter Statement of Facts Pursuant to Rule 56.1 filed on October 31, 2022 ("Pl. 56.1" or "56.1 Counter Statement"), ECF No. 47; the exhibits submitted contemporaneously with defendants' motion for summary judgment and appended to the declaration of Joseph Wodarski ("Wodarski Decl."), ECF No. 43; and the exhibits submitted contemporaneously with Plaintiff's Response, ECF No. 46.

As detailed _infra_, plaintiff's 56.1 Counter Statement is replete with conclusions and statements that are unsubstantiated by citations to the record or the record itself.  Accordingly, we have undertaken "an assiduous review of the record" to determine whether material facts are in dispute.  See Spiegel v. Schulmann, 604 F.3d 72, 83 (2d Cir. 2010) (internal quotation marks omitted); see also Congregation Rabbinical Coll. of Tartikov, Inc. v. Vill. of Pomona, 138 F. Supp. 3d 352, 394 (S.D.N.Y. 2015), aff'd sub nom. Congregation Rabbinical Coll. of Tartikov, Inc. v. Vill. of Pomona, NY, 945 F.3d 83 (2d Cir. 2019) ("[A] Rule 56.1 statement 'is not itself a vehicle for making factual assertions that are otherwise unsupported in the record.'  For that reason, 'where the record does not support the assertions in a Local 56.1 statement, those assertions [are] disregarded and the record reviewed independently.'") (quoting Holtz v. Rockefeller & Co., Inc., 258 F.3d 62, 74 (2d Cir. 2001)).

caused plaintiff to be "swung back," at which point his back
"slammed" into the edge of the door frame, his head "whipp[ed]
back" and hit his vehicle, and he was forced to lunge into the
car.  Id. ¶¶ 3, 4-5, 7, 46; ECF No. 43-5, Wodarski Decl. Ex. E,
March 2, 2020 Deposition of Douglas Welch ("Welch Tr.") at 27, 29,
31-34.  Defendants challenge plaintiff's recital.  Crucially, a
surveillance video recording of the incident does not show
plaintiff hitting his back on the door frame with any force,
sustaining any visible head injuries, or lunging into the
vehicle.  Defs. 56.1 ¶¶ 6-9; ECF No. 43-13, Wodarski Decl. Ex. M
(the "Accident Video").

Approximately 30 minutes after the accident, police officers
arrived and took information from both drivers.  Welch Tr. at 44-
45.  An accident report filed thereafter notes that "no injuries
[were] stated" at the scene by either Welch or Ayala.  ECF No. 43-
11, Wodarski Decl. Ex. K, New York State Department of Motor
Vehicles Police Accident Report (the "Police Accident Report").
Welch acknowledges that he did not ask the responding officers to
call him an ambulance, nor did the officers offer to call him an
ambulance.  Welch Tr. at 45-48.  Plaintiff also did not call
himself an ambulance, seek medical assistance at the scene, or
seek medical assistance at all on the day of the accident.  Id.
Instead, plaintiff waited a few hours for his car to be towed,

-4-

after which he went back upstairs to his wife's apartment.  Id. at
46-47.

## II.  Medical Treatment and Employment

Plaintiff initially testified that he sought care at Lawrence
Hospital in Bronxville the day after the accident.  Welch Tr. at
47-48.  However, plaintiff later admitted in his 56.1 Counter
Statement that he actually first sought care at Lawrence Hospital
three days after the accident, where he was "treated and
released."  Pl. 56.1 ¶ 16; Welch Tr. at 49.

Within nine days of the accident, on July 3, 2017, plaintiff
returned to his job as a parking productions assistant ("PPA") at
CBS Studios.  See ECF No. 43-12, Wodarski Decl. Ex. L, CBS
Employment Records (the "CBS Employment Records").  Welch did not
miss any days of work, because at the time of the accident, he was
on a scheduled "hiatus" from his job as CBS Studios "reset" during
a "break to get ready for the next season" of shows.  Welch Tr. at
73-74.  Plaintiff testified that he typically worked 90-100 hours
per week, Welch Tr. at 9-14, and upon returning to work, records
obtained from CBS studios show that plaintiff worked between 70.5-
126 per week over the following 8 weeks.  See CBS Employment
Records.  Those records also showed that plaintiff worked a total
of 542.3 hours between July 3, 2017 and August 3, 2017 and worked
750.8 hours between August 30, 2017 through December 2017, for a

-5-

total of 1,293.1 hours between July 3, 2017 and the end of December 2017.  Id.

Plaintiff initiated physical therapy eighteen days after the accident, which he attended 48 times over the following thirteen months.  Defs. 56.1 ¶ 17; ECF No. 46-7, Ex. G to Pl. Response, Affirmation of Douglas Welch ("Welch Aff.") ¶ 7.  However, plaintiff voluntarily ceased attending physical therapy after September 11, 2018, Welch Aff. ¶ 7.[3]

Twenty-one days after the accident, Welch underwent an MRI of his lumbar spine without contrast at Lenox Hill Radiology.  Pl. 56.1 ¶ 18; Pl. Response at 4.  This was the only MRI of plaintiff's back taken in close proximity to the accident.  See Pl. Response. Plaintiff does not dispute that those images (the "MRI Images") showed:

> severe spinal stenosis at L4-5 due to facet arthritis
> with facet and ligamentum flavum hypertrophy.[4]  At L5-

---

[3] Plaintiff claims that he restarted physical therapy from September 2021 through October 2021, Welch Aff. ¶ 8, and, without proof, alleges he did "some [additional] therapy at home," Pl. 56.1 ¶ 17.

[4] The Court may (and hereinafter does) take judicial notice of medical terms using online medical dictionaries.  See Veras v. Jacobson, No. 18-cv-6724 (KMK), 2022 WL 2133842, at *2 n.4 (S.D.N.Y. June 14, 2022) (collecting cases).

Here, "spinal stenosis" refers to "[a] narrowing of the spinal canal (the long channel within the bony structure of the spine), usually as a result of hypertrophic (pertaining to abnormal enlargement) degenerative changes of the bony structures."  Spinal Stenosis, J.E. Schmidt, M.D., Attorneys' Dictionary of Medicine (Matthew Bender ed., 2022) (hereinafter "Attorneys' Dictionary of Medicine").  The "facet" refers to "[a] small, flat surface, especially on a bone or a tooth. . . . [A] facet may be part of a joint."  Facet, Attorney's Dictionary of Medicine.  The "ligamentum flavum" is "[a] ligament, consisting of yellow elastic tissue, which unites the laminae of adjacent vertebrae, thus

S1 there was severe facet arthropathy associated with grade 1 spondylolisthesis and bilateral foraminal impingement.[5]  There was some loss of signal over the spine due to the plaintiff's large body habitus.[6]

Pl. 56.1 ¶ 18.[7]  With particular respect to plaintiff's "body habitus," he stated in his deposition that his height was 5'7 and weight was 317 pounds on the date of the accident.  Welch Tr. at 63.

---

helping to hold the vertebrae together."  Ligamentum Flavum, Attorney's Dictionary of Medicine.  "Arthritis" generally refers to "1. Inflammation of a joint or joints[; or] 2. Any disease of joints involving inflammation and tissue changes."  Arthritis, Attorney's Dictionary of Medicine.  "Hypertrophy" refers to "[a]n abnormal enlargement of a part or an organ due to an increase in the size of its constituent cells." Hypertrophy, Attorney's Dictionary of Medicine.

[5] "Arthropathy" refers to "[a]ny disease of a joint or of joints." Arthropathy, Attorney's Dictionary of Medicine.  "Spondylolisthesis of L5-S1" means "[t]he forward displacement (a slipping forward) of the fifth lumbar vertebra over the top surface of the first sacral vertebra.  (The fifth lumbar vertebra sits normally on the top of the first sacral vertebra, which is the top of the sacrum.)."  Spondylolisthesis of L5 Upon S, Attorney's Dictionary of Medicine. "Grade 1" spondylolisthesis is considered "low-grade" and is seen "in almost all cases of degenerative spondylolisthesis."  See Spondylolisthesis, Cleveland Clinic https://my.clevelandclinic.org/health /diseases/10302-spondylolisthesis (last visited August 21, 2023).  "Foraminal" means "[p]ertaining to a foramen (a natural opening, especially in a bone)." Foraminal, Attorney's Dictionary of Medicine.  "Bilateral" means "[p]ertaining to, or affecting, both sides."  Bilateral, Attorney's Dictionary of Medicine. And "impingement" refers to "the act or fact of interfering with something, especially a nerve, through contact or pressure."  See Impingement, Dictionary.com, https://www.dictionary.com/browse/impingement (last visited August 21, 2023).

[6] "Habitus" refers to "[t]he build of the body, especially as it is associated with predisposition to certain diseases."  Habitus, Attorney's Dictionary of Medicine.

[7] Indeed, plaintiff's affirmation from radiologist Dr. Kenneth Blumberg ("Dr. Blumberg") is in agreement that the MRI Images revealed severe spinal stenosis at L4-5 and grade 1 spondylolisthesis L5-S1 with bilateral foraminal impingement. ECF No. 46-1, Ex. A to Pl. Response, Affirmation of Dr. Kenneth Blumberg, M.D. ("Blumberg Aff.") at 1.

After his initial MRI in July of 2017, plaintiff sought treatment from three licensed doctors through early February of 2019, each of whom submitted affirmations, which, according to plaintiff, demonstrate that his injuries are serious and causally related to the accident.

First, Dr. Rafael Abromov, D.O. ("Dr. Abromov"), a back pain specialist, examined Welch on July 10, 2017, January 8, 2018, February 26, 2018, April 30, 2018, September 17, 2018, and December 3, 2018. See ECF No. 46-3, Ex. C to Pl. Response, Affirmation of Dr. Rafael Abromov, D.O. ("Abromov Aff."). Dr. Abramov writes that plaintiff's range of motion of the lumbar spine was limited, and plaintiff suffered from tenderness in his lumbar spine and persistent pain. Id. ¶¶ 4-22. Moreover, Dr. Abramov reviewed the MRI Images and determined -- as defendants' doctors also did -- that plaintiff suffered from spondylolisthesis in the lumbar region. Id. ¶ 8. Dr. Abromov further concluded, without explanation, that Welch's treatment was "causally related to the motor vehicle accident of June 24, 2017" and recommended surgery. Id. ¶ 24. However, he also discussed "lifestyle modifications and weight loss" with plaintiff. Id. ¶ 23. Welch acknowledges that he was advised to lose weight, because "having a lot of weight in the stomach area can also effect [sic] your back, [your] core effects [sic] your back." Welch Tr. at 63.

-8-

Second, plaintiff saw Dr. Boleslav Koharskyy, M.D. ("Dr. Koharskyy"), a pain management specialist who examined Welch four times between January 30, 2018 and September 27, 2018 and reached similar conclusions. See ECF No. 46-5, Ex. E to Pl. Response, Affirmation of Dr. Boleslav Koharskyy, M.D. ("Koharskyy Aff.")[8] He agrees that the MRI Images revealed "severe spinal stenosis," which he states was caused by "facet disease,"[9] and implies that this condition existed prior to the accident in noting that plaintiff's condition was made "significantly worse[]" by the accident. Koharskyy Aff. ¶¶ 3, 5, 6, 9, 12, 14 (emphasis added). Dr. Koharskyy also recommended epidural steroid injections as treatment, which plaintiff underwent on May 17, 2018 and September 27, 2018. Id. ¶¶ 12, 17.

---

[8] Specifically, nine months after the accident, he diagnosed Welch with "cervical disc displacement unspecified cervical region"; radiculopathy in the cervical region; "other intervertebral disc displacement, lumbar region; and other intervertebral disc displacement, lumbrosacral region." Id. ¶ 8.

"Radiculopathy" refers to a condition a "pinched" or "damaged" nerve roots in one's spine. Radiculopathy, Johns Hopkins Medicine, https://www.hopkinsmedicine.org/health/conditions-and-diseases/radiculopathy (last visited August 21, 2023). "While radiculopathy can't always be prevented, staying physically fit and maintaining a healthy weight may reduce your risk of radiculopathy." Id.

[9] "Facet joint disease is a condition in which the joints of the spine become a source of pain. This is a very common disease process and its prevalence increases with aging." Facet Joint Disease, NIH National Center for Biotechnology Information, https://www.ncbi.nlm.nih.gov/books/NBK541049/ (last visited August 16, 2023). "The most common cause of facet joint disease is degeneration of the spine, also known as spondylosis." Id.

Third, plaintiff saw Dr. Angel Macagno ("Dr. Macagno"), an orthopedic surgeon who examined him twice, first on November 7, 2017 and again on February 5, 2019. See ECF No. 46-4, Ex. D to Pl. Response, Affirmation of Dr. Angel Macagno, M.D. ("Macagno Aff.") ¶¶ 3-8. After outlining plaintiff's subjective reports of pain and his range of motion limitations and reviewing the MRI Images, Dr. Macagno concluded that, consistent with defendants' description of the MRI Images, plaintiff suffered from: spondylolisthesis in the lumbar region; spinal stenosis in the lumbar region; and low back pain, as well as radiculopathy in the lumbar region. Id. ¶ 5. In his affirmation -- and without further explanation -- Dr. Macagno wrote that his "problem[s]" (presumably the above-referenced medical conditions) were "causally related to the [accident]," and "the treatment provided to Mr. Welch was medically necessary and causally related to the motor vehicle accident of June 24, 2017." Id. ¶¶ 5, 9. Last, Dr. Macagno noted that "[t]he patient was a candidate" for surgery, specifically "a L5-S1 fusion with a L4-L5, L5-S1 posterior decompression." Id. ¶ 5.

Finally, approximately three years after the accident and over a year after his last visit with Dr. Macagno, plaintiff visited another orthopedic surgeon, Dr. Michael Gerling, M.D. ("Dr. Gerling"). See ECF No. 46-6, Ex. F to Pl. Response,

Affirmation of Dr. Michael Gerling, M.D. ("Gerling Aff.") ¶ 3.  In total, Dr. Gerling conducted nine examinations of plaintiff between March 2020 and July 20, 2022.  Id. ¶¶ 3-38.  During his March 2020 examination, Dr. Gerling concluded that plaintiff suffered from a "lumbar strain and cervical strain."  Id. ¶ 5. Dr. Gerling later reviewed the MRI Images and ordered an additional MRI, after which he found that plaintiff suffered from "lumbar disc disease with radiculopathy;[10] spondylolisthesis of lumbar region and disc herniation"[11] and recommended that plaintiff undergo surgery.  Id. ¶ 8.[12]  Plaintiff was also told to lose weight

---

[10] "Lumbar disc disease" refers to a "[b]ulging disk" or "[r]uptured or herniated disk," and "is caused by a change in the structure of the normal disk.  Most of the time, disk disease happens as a result of aging and the normal break down that occurs within the disk.  Sometimes, severe injury can cause a normal disk to herniate.  Injury may also cause an already herniated disk to worsen." Lumbar Disc Disease (Herniated Disc), Johns Hopkins Medicine, https://www.hopkinsmedicine.org/health/conditions-and-diseases/lumbar-disc-disease-herniated-disc#:~:text=Lumbar%20disk%20disease%20may%20occur,worse%20by%20movement%20and%20activity (last visited August 21, 2023).

[11] "Herniation" refers to "[a]n abnormal protrusion of an organ, tissue, or any anatomical structure, through a weak spot or forced opening in some part of the surrounding wall or partition; the act or fact of so protruding."  Herniation, Attorney's Dictionary of Medicine.

[12] An affirmation from radiologist Dr. Robert Traflet ("Dr. Traflet") stated that the March 2020 MRI revealed, with respect to the lumbar spine: prominent broad based annular bulging at L4-L5 and L5-S1 with impingement and mild annular bulging at L2-L3 and L3-L4; facet arthropathy at L4-L5 and L5-S1; and L5-S1 spondylolisthesis with prominent disc desiccation and disc narrowing.  ECF No. 46-2, Ex. B to Pl. Response, Affirmation of Dr. Robert Traflet, M.D. ("Traflet Aff.") at 1.  Dr. Traflet also wrote, regarding the cervical spine, that the March 2020 MRI showed: bulging annuli, C3-C4, C4-C5, T1-T2, T2-T3, and T3-T4, as well as disc herniations C5-C6 and C6-C7; spondylosis, foraminal stenosis including at C5-C6 and C6-C7 bilaterally and at C3-C4 to the right; and straightening of lordosis.

"Annular bulging" refers to bulging of the "annulus fibrosus," or "[t]he marginal or peripheral portion of an intervertebral disk[, and] [a]n intervertebral disk is a disk of cartilage which lies in the space between two

-11-

as a prerequisite for surgery, which he did, going from 317 pounds to approximately 260 pounds.  Welch Tr. at 63.  On August 11, 2021, Dr. Gerling performed lower back surgery on plaintiff, which consisted of a transforaminal lumbar interbody fusion (right side) L4/5, L5/S1; laminectomy, facetectomy, and foraminotomy lumbar right side L4/5, L5/S1; and arthrodesis L4/5, L5/S1.  Gerling Aff. ¶ 14.[13]  Plaintiff continued consultations with Dr. Gerling after his surgery, during which he presented with pain and range of

---

vertebrae, acting as a cushion."  Annulus Fibrosus, Attorney's Dictionary of Medicine.  "Disc desiccation" refers to "dehydration . . . of the disc material[, which] reduces the flexibility and typically the height of the disc."  About Degenerative Disc Disease, UCLA Health, https://www.uclahealth.org/medical-services/neurosurgery/conditions-treated/degenerative-disc-disease (last visited August 21, 2023).  "Cervical Spondylosis" refers to "[a] degenerative disease of the vertebrae of the neck affecting the joints (between the vertebrae), the disks between the vertebrae, and the surrounding ligaments and connective tissue."  Cervical Spondylosis, Attorney's Dictionary of Medicine.  "Lordosis" refers to "[a]n abnormal bending or curving of the spine in which the bulge or convexity is forward.  The deformity affects the lower part of the spine, in the lumbar region, at the level of the loins.  The spine is normally slightly curved forward in this region; lordosis represents an exaggeration of the normal curvature."  Lordosis, Attorney's Dictionary of Medicine.

[13] A "transforaminal lumbar interbody fusion" refers to "[a] method of performing spinal fusion (joining of adjacent vertebrae to one another) through a posterior approach, through the lateral portion of the vertebral foramen (the central opening in a vertebra through which the spinal cord passes)."  Transforaminal Lumbar Interbody Fusion, Attorney's Dictionary of Medicine.  "Laminectomy" refers to "[a] surgical operation in which the posterior arch of a vertebra is removed."  Laminectomy, Attorney's Dictionary of Medicine.  "Facetectomy" refers to "[t]he surgical removal of an articular facet . . . of a vertebra."  Facetectomy, Attorney's Dictionary of Medicine.  "Foraminotomy" refers to "[a] surgical operation for the enlargement of an intervertebral foramen (a normal opening between two vertebrae of the spine).  It is done to relieve pressure on the root of a spinal nerve, a nerve passing through an intervertebral foramen."  Foraminotomy, Attorney's Dictionary of Medicine.  "Arthrodesis" refers to "[t]he surgical procedure of making a joint immovable by causing the surfaces of the bones to fuse or grow together.  The immobilization of a joint is used as treatment in certain diseases of the bones or joint."  Arthrodesis, Attorney's Dictionary of Medicine.

motion loss.  Id. ¶¶ 15-38.  Plaintiff also re-gained some of the weight he had lost prior to his surgery.  See Wodarski Decl. Ex. F, December 14, 2020 Deposition of Douglas Welch ("Welch December Tr."), at 22 ("I weighed less when I had the surgery.").  Dr. Gerling concluded, without further explanation, that plaintiff had "no prior history of cervical or lumbar disorders," and thus it "[wa]s [his] professional opinion that the cervical and lumbar spine injuries [suffered by plaintiff], treatments [suffered by plaintiff] and resultant permanent disability are directly causally related to the above stated accident."  Gerling Aff. ¶ 40.

In stark contrast to plaintiffs' doctors, defendants submitted affirmations from two doctors who concluded that plaintiff sustained minor injuries from the accident, and any serious conditions from which plaintiff suffers were, and are, degenerative and preexisting.  First, Dr. Pierce Ferriter ("Dr. Ferriter"), an orthopedic surgeon, reviewed the MRI Images and conducted two physical examinations of plaintiff, one pre-surgery on October 26, 2020 and the other post-surgery on February 11, 2022.  ECF No. 43-8, Wodarski Decl. Ex. H, February 11, 2022 Affirmation of Dr. Pierce Ferriter, M.D. ("Feb. 2022 Ferriter Aff."); ECF No. 43-9, Wodarski Decl. Ex. I, October 26, 2020 Affirmation of Dr. Pierce Ferriter, M.D. ("Oct. 2020 Ferriter

Aff."). With respect to his first examination, Dr. Ferriter concluded that the MRI Images taken twenty-one days after the accident showed advanced disc degeneration at the L5-S1 level with Grade I to Grade II spondylolisthesis based on degeneration and arthropathy of the facet joints, as well as stenosis.[14] Oct. 2020 Ferriter Aff. at 9. Dr. Ferriter also conducted a physical examination, during which plaintiff displayed normal range of motion in his cervical and thoracic spines but some deficient range of motion in his lumbar spine. Id. at 10-12. According to Dr. Ferriter, plaintiff's loss of mobility in his lumbar spine was due to "arthritis of the spine and [plaintiff's] current body habitus," i.e., his weight. Id. at 11-12. Relying on plaintiff's explanation of the accident, Dr. Ferriter listed plaintiff's injuries from the accident as a "strain/sprain" in his cervical spine and noted that: plaintiff's injuries were not permanent; the MRI Images did not reveal any traumatic injuries to the spine; and plaintiff's cervical spine sprain and strain had resolved. Id. at 10-12. In addition, Dr. Ferriter stated that plaintiff did not suffer from an orthopedic disability, and he did not find a medical necessity for a causally related surgery. Id. at 12.

---

[14] "Grade II" spondylolisthesis is also considered "low-grade." See Spondylolisthesis, Cleveland Clinic https://my.clevelandclinic.org/health /diseases/10302-spondylolisthesis (last visited August 21, 2023).

Dr. Ferriter's second examination occurred in February of 2022 (approximately six months after plaintiff's surgery), and he again concluded that: any injuries plaintiff suffered as a result of the accident had resolved; plaintiff did not suffer any traumatic injuries to the lumbar spine as a result of the accident; and Welch's surgery was not causally related to the accident, but instead reflected unrelated, degenerative changes.   Feb. 2022 Ferriter Aff. at 11.

Second, defendants submitted a report by radiologist Dr. Jessica Fuchs Berkowitz ("Dr. Berkowitz"), who reviewed the MRI Images taken less than three weeks after the accident and concluded that plaintiff suffered from:

- A congenitally narrow spinal canal in the lumbar region as well as possible small amount of epidural lipomatosis;[15]

- A disc bulge and hypertrophic facet joint changes causing marked central spinal stenosis and moderate bilateral lateral recess stenosis, L4-5;[16] and

---

[15] "Congenital refers to a condition or trait that exists at birth."  National Institute of Health Human Genome Research Institute, https://www.genome.gov/ genetics-glossary/Congenital (last visited August 21, 2023).  "Lipomatosis" refers to "[a] condition marked by tumor-like deposits of fat in various parts of the body."  Lipomatosis, Attorney's Dictionary of Medicine.

[16] "The lateral recess is the region of the lumbar canal that is bordered laterally by the pedicle, posteriorly by the superior articular facet and ligamentum flavum, and anteriorly by the vertebral body, endplate margin, and disk margin."  In addition, "[t]he lateral recess has been reported as the principal compression site in lumbar spinal canal stenosis."  Ahmet Colak et al., A Less Invasive Surgical Approach in the Lumbar lateral Recess Stenosis: Direct Approach to the Medial Wall of the Pedicle, National Institute of Health National Library of Medicine, https://www.ncbi.nlm.nih.gov/pmc/articles

- A possible minimal disc bulge, marked hypertrophic facet joint changes and minimal grade 1 spondylolisthesis resulting in marked right-sided neural foraminal narrowing, L5-S1.

ECF No. 43-7, Wodarski Decl. Ex. G, February 11, 2022 Affirmation of Dr. Jessica Fuchs Berkowitz, M.D. ("Dr. Berkowitz Aff.") at 9. Dr. Berkowitz found that: (i) the "disc bulges and hypertrophic facet joint changes are chronic and degenerative in origin"; (ii) "[t]he grade 1 spondylolisthesis at L5-Sl is due to degenerative changes at the disc space and facet joints; and (iii) "[t]here is no evidence of acute traumatic injury to the lumbar spine such as vertebral fracture, asymmetry of the disc spaces, ligamentous rupture or epidural hematoma." Id. (emphasis added). In sum, she found "no causal relationship between the claimant's alleged accident and the findings on the MRI examination." Id. (emphasis added).

## III. Claimed Injuries

Plaintiff alleges that the following physical injuries were caused by the accident:

### Cervical Spine

- Disc displacement
- Radiculopathy

---

/PMC2587672/#:~:text=The%20lateral%20recess%20is%20the,8%2C%2011%2C%2033%5D (October 1, 2008).

<u>**Lumbar Spine**</u>

- Disc displacement
- Severe spinal stenosis at L4/5
- Facet Disease
- Grade 1 spondylolisthesis L5-S1 associated with bilateral foraminal impingement
- Radiculopathy
- Myofascial pain and muscle spasm

ECF No. 43-3, Wodarski Decl. Ex. C, Plaintiff's Responses to Defendants' Interrogatories ("Pl. Interrog. Responses") ¶ 8. He claims that all of those injuries are "permanent and progressive, except those of a superficial nature." <u>Id.</u> Welch also alleges supplemental injuries, which are primarily psychological:

- Post Traumatic Stress Disorder
- Depressive Episodes
- Anxiety Disorder
- Chronic Pain Due to Trauma
- Post-Concussion Syndrome
- Social Isolation
- Anticipated Need for Psychotherapy
- Anticipated Need for Psychiatric Treatment
- Anticipated Need for Neurology Referral

ECF No. 43-4, Wodarski Decl. Ex. D, Plaintiff's Supplemental Verified Bill of Particulars ("Pl. Supp. Interrog. Responses") at 1.

**LEGAL STANDARDS**

## I. Summary Judgment

Summary judgment is appropriate when the moving party "shows that there is no genuine dispute as to any material fact and the

movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "A fact is material when it might affect the outcome of the suit under governing law." McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 202 (2d Cir. 2007) (internal quotation marks omitted) (quoting Jeffreys v. City of New York, 426 F.3d 549, 553 (2d Cir. 2005)).  A factual dispute is genuine if a reasonable factfinder could decide in the nonmoving party's favor.  Id.

The moving party must "make a prima facie showing that it is entitled to summary judgment." Celotex Corp. v. Catrett, 477 U.S. 317, 331 (1986).  If it does so, then there is no issue for trial unless the party opposing summary judgment presents "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).  At summary judgment, a court must resolve all ambiguities and draw all justifiable inferences in the nonmoving party's favor.  Id. at 255.

## II.  New York's No-Fault Law

In cases governed by New York's No-Fault Law, a defendant moving for summary judgment "must establish a prima facie case that plaintiff did not sustain a 'serious injury' within the meaning of Insurance Law § 5102(d)." Yong Qin Luo v. Mikel, 625 F.3d 772, 777 (2d Cir. 2010) (quoting Barth v. Harris, 00-cv-1658 (CM), 2001 WL 736802, at *2 (S.D.N.Y. June 25, 2001)); see also

Evans v. United States, 978 F. Supp. 2d 148, 162–63 (E.D.N.Y. 2013) ("When moving for summary judgment in a case involving the No-Fault Law . . . defendant has the initial burden to make an evidentiary showing that the plaintiff has not sustained a serious injury as a matter of law") (internal quotation marks omitted). Under Article 51 of the No-Fault Law, a "serious injury" is defined as an injury that results in one of the following:

> [1] death; [2] dismemberment; [3] significant disfigurement; [4] a fracture; [5] loss of a fetus; [6] permanent loss of use of a body organ, member, function or system; [7] permanent consequential limitation of use of a body organ or member; [8] significant limitation of use of a body function or system; or [9] a medically determined injury or impairment of a non-permanent nature which prevents the injured person from performing substantially all of the material acts which constitute such person's usual and customary daily activities for not less than ninety days during the one hundred eighty days immediately following the occurrence of the injury or impairment [hereinafter the "90/180" category].

N.Y. Ins. Law § 5102(d).

Once a defendant has established a prima facie case that plaintiff did not sustain a "serious injury" under § 5102(d), "the plaintiff must rebut with sufficient admissible evidence to raise a genuine issue of fact as to whether the plaintiff has sustained a serious injury." Rivera v. United States, No. 10-cv-5767 (MHD), 2012 WL 3132667, at *10 (S.D.N.Y. July 31, 2012). Rather than

rely solely on subjective complaints, "a plaintiff must offer objective proof of an injury." Id. (emphasis added).

Finally, and of particular relevance here, "a plaintiff is [also] required to present competent, non-conclusory expert evidence sufficient to support a finding, not only that the alleged injury is 'serious' within the meaning of Insurance Law § 5102(d), but also that the injury was proximately caused by the accident at issue." Carter v. Full Serv., Inc., 29 A.D.3d 342, 344 (1st Dep't 2006) (emphasis added); see also Arenes v. Mercedes Benz Credit Corp., No. 03-cv-5810 (NG) (MDG), 2006 WL 1517756, at *8 (E.D.N.Y. June 1, 2006) ("Even when there is objective medical proof that a plaintiff sustained a serious injury, when additional contributory factors interrupt the chain of causation between the accident and claimed injury--such as a gap in treatment, an intervening medical problem or a pre-existing condition--summary dismissal of the complaint may be appropriate.").

Defendants are therefore entitled to summary judgment if either (i) there is no genuine dispute of material fact that the accident did not cause the alleged serious injuries; or (ii) there is no genuine dispute of material fact that plaintiff's injuries are not serious. See, e.g., Rhone v. United States, No. 04-cv-5037, 2007 WL 3340836, at *10 (S.D.N.Y. Nov. 9, 2007) ("Given the Court's holding that there is no triable issue of fact as to

whether the Government proximately caused plaintiff's injuries, the Court need not consider the Government's claim regarding whether [plaintiff] can meet the serious injury threshold."); Carter, 29 A.D.3d at 344 (explaining that to recover damages for non-economic loss related to an injury sustained in an accident, "a plaintiff is required to present competent, non-conclusory expert evidence sufficient to support" findings of seriousness and causation); accord Conde v. United States, No. 19-cv-8506 (NRB), 2021 WL 3604701, at *5 (S.D.N.Y. Aug. 13, 2021).

## DISCUSSION

Defendants have articulated three independent (though related) theories under which they are entitled to summary judgment. First, the physical circumstances of the accident -- in conjunction with plaintiff's behavior immediately thereafter and over the following days, weeks, and months -- precludes any link between the accident and his claimed serious injuries. Second, the medical affirmations offered by both parties' doctors establish that plaintiff did not suffer traumatic injuries from the accident, but rather the conditions for which he holds defendants responsible are degenerative, i.e., longstanding. Third, no reasonable jury could conclude that the injuries he did sustain from the accident qualify as serious injuries under New York's No-Fault Law.

With the above foundation in mind, we first address the accident itself and plaintiff's actions thereafter.

## I. The Circumstances of the Accident and Its Aftermath Entitle Defendants to Summary Judgment

Defendants' non-medical evidence establishes a <u>prima facie</u> showing that the accident did not cause plaintiff's injuries. Crucially, defendants produce a high-resolution, real-time video of the accident, which, contrary to Welch's representations to the Court, reveals a collision which appears to have minimally impacted plaintiff. <u>See</u> Accident Video. Specifically, the Accident Video shows Ayala's vehicle hitting the edge of Welch's driver side door, after which plaintiff jolts up in surprise and briefly stumbles backward. Welch's back then contacts the edge of his door frame without much force. After Ayala exits his vehicle, plaintiff is seen alternatively standing and walking around his vehicle for minutes with no disturbance in his gait or obvious signs of physical pain.[17]

---

[17] Plaintiff and his counsel nonetheless engage in exaggerations -- and occasionally outright lies -- to dispute the clear sequence of events shown on the Accident Video. Plaintiff falsely contends, either explicitly or by implication, that he: (i) was "slammed into the door frame of his vehicle," Pl. 56.1 ¶ 46; (ii) his head "whipp[ed] back" such that he "sustain[ed] head injuries" by hitting his head on the door frame and the roof, <u>id.</u> ¶¶ 7, 10, Welch Tr. at 29-32; and (iii) he experienced these back and head injuries while trying to "lunge" or "jump" into his car to avoid Ayala's vehicle, Welch Tr. at 31, 34.

It is particularly concerning that plaintiff's distortions in his 56.1 Counter Statement were submitted after defendants' exhibits -- including the Accident Video -- were filed with the Court.

Defendants supplement the Accident Video with evidence demonstrating that plaintiff did not conduct himself as though the accident caused injuries of any consequence during the following hours, days, and weeks. First, Welch did not state to the police officers who arrived at the scene 30 minutes after the accident that he sustained <u>any</u> injuries. <u>See</u> Police Accident Report; <u>Park v. Champagne</u>, 34 A.D.3d 274, 275 (1st Dep't 2006) (<u>prima facie</u> case for dismissal established when plaintiff "told a responding police officer that she was uninjured"). Second, neither plaintiff nor the officers called an ambulance, and plaintiff admits that he returned home after the accident and did not seek medical care for three days. Welch Tr. at 45–48; <u>Park</u>, 34 A.D.3d at 275 (<u>prima facie</u> case for dismissal established when plaintiff "did not seek treatment at a hospital after the incident"). Last, and significantly, plaintiff returned to full-time, physically active work on the first day he could have returned to his job and within nine days of the accident, worked between 70.5–126 per week over the following 8 weeks, and worked 1,293.1 hours between July 3, 2017 and the end of December 2017. <u>See</u> CBS Employment Records; <u>Rivera</u>, 2012 WL 3132667, at *14 (<u>prima facie</u> case established when defendant presented evidence that plaintiff was regularly working after the accident); <u>Schultz v. Von Voight</u>, 216 A.D.2d 451–52 (2d Dep't 1995), <u>aff'd</u>, 86 N.Y.2d 865 (N.Y. 1995) (<u>prima facie</u> case

-23-

established when plaintiff did not seek medical treatment following the accident and was not absent from work as a result of his alleged injuries).[18]

Welch, in turn, fails to rebut defendants' <u>prima facie</u> showing with any evidence, much less evidence creating a triable issue of fact. Plaintiff's medical affiants -- Dr. Macagno, Dr. Abramov, Dr. Koharskyy, and Dr. Gerling -- merely write, without more, that Welch's injuries and treatment were "causally related to the motor vehicle accident of June 24, 2017," while Dr. Gerling adds (over three years after the fact) that Welch "sustained significant musculoskeletal injuries to his neck and low back in the above stated [sic] accident." <u>See</u> Macagno Aff ¶ 9; Abramov Aff. ¶ 24; Koharskyy Aff. ¶ 19; Gerling Aff. ¶¶ 39, 42. Plaintiff's radiologists also offer no explanation with respect to causation. <u>See</u> Blumberg Aff.; Traflet Aff.

Plaintiff's conclusory medical affirmations are fatal to his case because they do not address (and certainly do not refute) (i) the only reasonable interpretation of the Accident Video, <u>i.e.,</u> that the force and mechanics of the accident likely could

---

[18] Plaintiff again disputes these facts in the face of clear evidence. Indeed, Welch inexplicably denies that: (i) he did not state any injuries to officers who appeared at the scene, <u>see</u> Pl. 56.1 ¶ 11; (ii) he did not call an ambulance or seek medical treatment on the day of the accident, <u>id.</u> ¶¶ 14-15; and (iii) he returned to his job at CBS Studios within nine days of the accident and worked the hours reflected on the detailed weekly timesheets from plaintiff's employer, <u>see</u> <u>id.</u> ¶¶ 33-44.

not have caused plaintiff's claimed injuries,[19] nor (ii) the evidence demonstrating plaintiff's failure to seek contemporaneous medical attention and his immediate, full-time return to work. See Pommells v. Perez, 4 N.Y.3d 566, 575 (N.Y. 2005) ("Plaintiff's submission left wholly unanswered the question whether the claimed symptoms diagnosed by [his doctor] were caused by the accident."); Thompson v. Abbasi, 15 A.D.3d 95, 99 (1st Dep't 2005) ("Dr. Gutstein's conclusory assertion, more than 2 1/2 years after the accident, that 'it is my opinion that the motor vehicle accident of November 26, 1999 was a competent producing cause of these injuries,' without any detail, rationale, or reasonable explanation, cannot serve to supply what plaintiff's objective proof clearly lacks.").

Summary judgment is thus appropriate here, where Welch's expert reports "said nothing about the etiology of [his] injuries, and . . . contained only a conclusory assertion that there was a causal connection between the injuries and the accident." Graves v. L & N Car Serv., 87 A.D.3d 878, 879 (1st Dep't 2011); see also Montgomery v. Pena, 19 A.D.3d 288, 289 (1st Dep't 2005) (granting summary judgment where "plaintiff failed to come forward with the

---

[19] Plaintiff's failure to produce any proof articulating why the accident shown on tape could have caused plaintiff's injuries is particularly telling, because Welch had sufficient opportunity to advance an evidence-based analysis of the Accident Video through expert testimony and failed to do so.

objective proof required to create a triable issue as to whether
her alleged injuries, even if assumed to have met the serious
injury threshold, were caused by the subject motor vehicle
accident.") (internal quotation marks and citation omitted).

The Court next addresses why the parties' medical evidence
provides an independent basis on causation grounds to grant
defendants' motion.

## II.  The Parties' Medical Evidence Also Entitles Defendants to Summary Judgment

Defendants further maintain that plaintiff's alleged injuries
are not ascribable to the accident because they are preexisting,
degenerative conditions, and any sequela from the accident
resolved themselves long ago.  In support, they submit analyses by
Dr. Ferriter and Dr. Berkowitz of the only MRI taken of plaintiff's
back within to the accident and conclude that the MRI Images
revealed degenerative (i.e., longstanding) injuries.  See Oct.
2020 Ferriter Aff. at 11-12 (finding that plaintiff's injuries
showed "degeneration of the disc and arthritis"); Berkowitz Aff.
at 9 (finding "no causal relationship between the claimant's
alleged accident and the findings on the [lumbar] MRI examination,"
that plaintiff suffered from "degenerative changes at the disc
space and facet joints" and that there was "no evidence of acute
traumatic injury to the lumbar spine such as vertebral fracture,
asymmetry of the disc spaces, ligamentous rupture or epidural

-26-

hematoma"). Moreover, in interpreting the MRI Images, Dr. Ferriter provides a ready explanation for why plaintiff developed these conditions: namely, his weight. See Oct. 2020 Ferriter Aff. at 11-12 (finding that plaintiff's injuries were due to his "body habitus"). These reasoned conclusions from Dr. Ferriter and Dr. Berkowitz are sufficient to establish prima facie entitlement to summary judgment. See, e.g., Arroyo v. Morris, 85 A.D.3d 679, 680 (1st Dep't 2011) (defendants established prima facie case that plaintiff did not sustain a serious injury by submitting a radiologist's affirmed reports stating that the MRI films of the lumbar spine revealed evidence of degenerative disc disease); Kerr v. Klinger, 71 A.D.3d 593, 593 (1st Dep't 2010) ("Defendant established her prima facie entitlement to summary judgment by submitting evidence, including the affirmed reports of a radiologist, who, upon reviewing the MRI films taken after plaintiff's accident, concluded that the disc bulges and/or herniations revealed therein were the result of degenerative disc disease and not caused by the automobile accident at issue."); Pommells, 4 N.Y.3d at 580 ("[W]ith persuasive evidence that plaintiff's alleged pain and injuries were related to a preexisting condition, plaintiff ha[s] the burden to come forward with evidence addressing defendant's claimed lack of causation.").

Plaintiff does not meet his burden to rebut defendants' showing, in significant part because plaintiffs' doctors agree that the MRI Images showed:

- severe spinal stenosis at L4-5 due to facet arthritis with facet and ligamentum flavum hypertrophy;

- severe facet arthropathy at L5-S1 associated with grade 1 spondylolisthesis and bilateral foraminal impingement; and

- some loss of signal over the spine due to the plaintiff's large body habitus.

Pl. 56.1 ¶ 18.[20]  In accepting these diagnoses, plaintiff and his doctors must necessarily concede that plaintiff's conditions are explicable as chronic and degenerative in origin.  <u>See, e.g.</u>, Spinal Stenosis, <u>Attorney's Dictionary of Medicine</u> (noting that "spinal stenosis" "usually [occurs] as a result of hypertrophic (pertaining to abnormal enlargement) <u>degenerative</u> changes of the bony structures") (emphasis added); Arthropathy, <u>Attorney's Dictionary of Medicine</u> (noting that "arthropathy" refers to "[a]ny <u>disease</u> of a joint or of joints" (emphasis added); Spondylolisthesis, Cleveland Clinic  https://my.cleveland clinic.org/health/diseases/10302-spondylolisthesis (last visited

---

[20]  Plaintiff adds that Welch "sustain[ed] additional injuries not listed [t]herein," but the only other physical injuries he alleges in his discovery responses are disc displacement in the cervical and lumbar spines and radiculopathy, myofascial pain, and muscle spasms in the lumbar spine.  Pl. Interrog. Responses ¶ 8.

August 21, 2023) (noting that "Grade 1" spondylolisthesis is considered "low-grade," and is seen "in almost all cases of degenerative spondylolisthesis") (emphasis added); Radiculopathy, Johns Hopkins Medicine, https://www.hopkinsmedicine.org/health/conditions-and-diseases/radiculopathy (last visited August 2, 2023). ("In most cases, foraminal stenosis is caused by gradual degeneration of the spine that happens as you age.") (emphasis added).

Moreover, plaintiff's doctors concur that his weight was (and is) obviously detrimental to the condition of his back. See Welch Tr. at 63 (plaintiff was advised during treatment that that "having a lot of weight in the stomach area can also effect [sic] your back, [your] core effects [sic] your back"). Indeed, Welch was ordered by Dr. Gerling to lose weight as a "prerequisite" to surgery. See Welch December Tr. at 22. Here again, though, plaintiff's doctors do not address why his medical conditions were caused by the accident rather than his weight or any other degenerative changes. See Kaplan v. Vanderhans, 26 A.D.3d 468, 469 (2d Dep't 2006) (plaintiff's affirmed medical reports "rendered speculative" by failing to address findings of defendants' radiologist who attributed plaintiff's cervical and thoracic injuries to degeneration); Lemieux v. Horn, 209 A.D.3d 1100, 1103 (3d Dep't 2022), aff'd, 39 N.Y.3d 1108 (N.Y. 2023)

(plaintiff failed to meet his burden on causation when he did not provide "objective medical evidence distinguishing his preexisting back condition from its purported exacerbation"); see also McHaffie v. Antieri, 190 A.D.2d 780, 781 (2d Dep't 1993) ("The opinions expressed by the plaintiff's experts as to causation . . . were stated in wholly conclusory terms, and are thus without evidentiary value."); Davis v. Evan, 304 A.D.2d 1023, 1025 (3d Dep't 2003) (summary judgment ruling affirmed when "[t]he diagnoses . . . contained in the affidavit of plaintiff's expert are not explained or defined or in any manner connected to plaintiff's limitations, symptoms or loss of functions and their significance is not delineated").

Because plaintiff does not rebut defendants' showing that "additional contributory factors [have] interrupt[ed] the chain of causation between the accident and [plaintiff's] claimed injur[ies]," Welch cannot meet his burden on causation and "summary dismissal of the complaint [is] appropriate." Arenes, 2006 WL 1517756, at *8.

Although our findings on causation alone entitle defendants to summary judgment, see Rhone, 2007 WL 3340836, at *10, we also address why plaintiff did not suffer a "serious injury" as contemplated by New York's No-Fault Law.

-30-

### III. **Plaintiff Did Not Suffer a Serious Injury**

Plaintiff also claims that his physical and psychological conditions qualify under the following serious injury categories:

- permanent loss of use of a body organ, member, function or system;

- permanent consequential limitation of use of a body organ or member;

- significant limitation of use of a body function or system; and

- the 90/180 category.

Pl. Interrog. Responses ¶ 7.  We disagree.

At the outset, plaintiff's claim that his alleged psychological conditions constitute serious injuries must be dismissed.  Defendants correctly argue that Welch has not submitted objective evidence that he suffers from any of his claimed psychological injuries or that the accident in question caused them.  Defs. Br. at 4.  Plaintiff, in turn, does not respond with proof -- such as medical records or affirmations from treating physicians -- that he suffers from those conditions.  Notably, Welch admits that he first sought treatment with a psychiatrist over three years after the accident, and as of his second deposition on December 14, 2020, had only been to a single Zoom session with a practitioner.  See Welch December Tr. at 53-55.  No reasonable jury could find that his claimed psychological injuries

are serious.  See Clark v. Basco, 83 A.D.3d 1136, 1139 (3d Dep't 2011) (summary judgment granted for defendant where plaintiff offered "no objective findings supporting [her alleged psychological] diagnoses and fail[ed] to set forth any adequate assessment of how the alleged injuries were causally related to the accident"); Taranto v. McCaffrey, 40 A.D.3d 626, 627 (2d Dep't 2007) (summary judgment appropriate when plaintiff could not raise a triable issue of fact regarding causal link between claim of psychological and emotional injuries and motor vehicle accident).

Turning to plaintiff's physical conditions, defendants have made a prima facie case that plaintiff's injuries do not meet any of the above-referenced categories.  With respect to permanent loss, permanent consequential limitation, and significant limitation of use, Dr. Ferriter concluded that any injuries suffered to the cervical, thoracic, or lumbar spines from the accident were minor, had resolved, and were not permanent.  Feb. 2022 Ferriter Aff. at 10-11; Oct. 2020 Ferriter Aff. at 10-11. Likewise, defendants' radiologist, Dr. Berkowitz, concluded that the MRI images did not show any traumatic injuries.  Berkowitz Aff. at 9.

These conclusions are also bolstered by the indisputable events, described supra, which occurred in the aftermath of the accident -- i.e., that: (i) no injuries were reported by Welch to

-32-

officers who appeared at the scene; (ii) plaintiff did not request an ambulance or medical treatment at the scene of the incident; (iii) plaintiff failed to seek medical attention on the day of the accident, instead waiting for three days to pass; and (iv) particularly relevant to the 90/180 category, plaintiff returned to his job at CBS Studios within nine days of the accident as soon as the hiatus at CBS studios ended and worked an extraordinary number of hours during the following months.  See Police Accident Report; CBS Employment Records.

The burden thus shifts to plaintiff to establish that he suffered a serious injury.  We conclude that he does not meet his burden and briefly discuss each alleged category in turn.

### a. Permanent Loss of Use

Plaintiff's injuries do not fit within the "[p]ermanent loss of use of a body organ, member, function or system" category.  Even under the most generous interpretation of plaintiff's injuries, he has not put forth any proof that he has suffered a "total loss" of use of any "body organ, member, function, or system."  See Comba v. United States, 535 F. Supp. 3d 97, 108 (E.D.N.Y. 2021); Oberly v. Bangs Ambulance Inc., 96 N.Y.2d 295, 297 (N.Y. 2001) ("Only a total loss of use is compensable under the 'permanent loss of use' exception to the no-fault remedy."); Davis v. Cottrell, 101 A.D.3d 1300, 1301 (3d Dep't 2012) ("[T]he record [must] include proof

that plaintiff has lost the total use of any body organ or
system.").

### b. Permanent Consequential Limitation

Plaintiff has also not suffered a permanent consequential
limitation of use of a body organ, member, or function.  To qualify
under this category, a plaintiff must "produce competent medical
evidence that [his] injuries are permanent."  Ventra v. United
States, 121 F. Supp. 2d 326, 333 (S.D.N.Y. 2000) (emphasis added).
A claim of permanence "must be supported by medical records and
not based solely on plaintiff's testimony and subjective
descriptions of pain."  Cabrera v. United States, No. 18-cv-07270,
2020 WL 5992929 (SDA), at *15 (S.D.N.Y. Oct. 9, 2020), appeal
dismissed (Feb. 18, 2021) (quoting Jones v. United States, 408 F.
Supp. 2d 107, 117 (E.D.N.Y. 2006)).  Here, plaintiff's ipse dixit,
subjective claim that he sustained "permanent" injuries -- which
"include[e] but [are] not limited to spinal stenosis, disc
displacement[] at various levels of [his] spine[,] and
radiculopathy," Welch Aff. ¶ 4 -- is insufficient.  In addition,
none of Dr. Blumberg, Dr. Traflet, Dr. Abramov, Dr. Macagno, Dr.
Koharskyy make any findings with respect to permanence and thus
cannot substantiate plaintiff's subjective claims.  See Blumberg
Aff.; Traflet Aff.; Abramov Aff.; Macagno Aff.; Koharskyy Aff.

-34-

Further, although Dr. Gerling opines that "Mr. Welch sustained a permanent and significant limitation to his cervical and lumbar spine" as a result of the accident, Gerling Aff. ¶ 40, that assessment is speculative and can be disregarded.  As noted earlier, plaintiff's experts -- including Dr. Gerling -- do not claim to have seen the Accident Video and consequently fail to explain why the collision shown on the Accident Video could have caused plaintiff's alleged injuries.  Nor do they ever address "an explanation for ruling out [degenerative] conditions as the cause of plaintiff's injuries."  Arroyo, 85 A.D.3d at 680; Perpall v. Pavetek Corp., No. 12-cv-0336 (PKC), 2017 WL 1155764, at *20 (E.D.N.Y. Mar. 27, 2017) ("Because Dr. Friedman's reports fail to indicate the objective basis for his conclusion that [plaintiff's] current physical limitations and pain are attributable to the 2010 accident rather than to her pre-existing conditions, there is no triable issue of fact as to whether the 2010 accident caused [plaintiff's] shoulder injuries."); Francis v. Christopher II, 302 A.D.2d 425, 425 (2d Dep't 2003) (plaintiffs failed to meet their burden, because "although the defendants' independent radiologist described the disc herniations and bulges found in both of the [plaintiffs] as relating to degenerative changes, the [plaintiffs'] experts failed to explain the significance of these findings"); Ifrach v. Neiman, 306 A.D.2d 380, 381 (2d Dep't 2003)

("[T]he plaintiff's expert failed to indicate his awareness that the plaintiff was suffering from degenerative spondyloarthropathy, and therefore, his finding that the plaintiff's current restrictions of motion in his spine were causally related to the subject accident was mere speculation.").

### c. Significant Limitation of Use

For similar reasons, plaintiff does not meet the significant limitation of use category.[21]   "To qualify as a significant limitation, the injury must be significant in both degree and duration."   Perez v. United States, No. 17-cv-4838, 2019 WL 2336526, at *10 (S.D.N.Y. June 2, 2019) (citation and internal quotation marks omitted).   "A 'significant' injury is one that results in 'more than a minor limitation of use.'"   Bass v. Hout, No. 13-cv-8516, 2019 WL 6527944, at *4 (S.D.N.Y. Dec. 4, 2019) (first citing Young Sung Lee v. Garvey, 718 F. App'x 11, 15 (2d Cir. 2017), and then citing Licari v. Elliot, 57 N.Y.2d 230, 236 (N.Y. 1982)).

---

[21] The "permanent consequential limitation" and "significant limitation of use" categories are similar.  To establish either category under New York's No-Fault Law, the medical evidence submitted by plaintiff must contain either objective, quantitative evidence with respect to diminished range of motion or a qualitative assessment evaluating plaintiff's present limitations vis-à-vis normal functioning.  Toure v. Avis Rent A Car Sys., Inc., 98 N.Y.2d 345, 350 (N.Y. 2002).  However, a significant loss of use is not identical to a permanent consequential limitation.  See Miller v. Miller, 100 A.D.2d 577, 578 (2d Dep't 1984) ("[T]he "significant limitation of use of a body function" does not require permanence, but instead requires a fact finding on the issue of whether the dysfunction is important enough to reach the level of significance.") (emphasis in original).

First, like the permanent consequential use category, plaintiff's subjective assessment of his injuries is insufficient to establish a significant limitation of use.  See Arrowood v. Lowinger, 294 A.D.2d 315, 316 (1st Dep't 2002).

Second, the affirmations submitted by plaintiff's doctors do not create a triable issue of fact.  First, even assuming that plaintiff's experts based their opinions on objective evidence, those opinions must be based upon a recent examination.  See Andrews v. Nachman, 258 A.D.2d 607, 607 (2d Dep't 1999); Wadi v. Tepedino, 242 A.D.2d 327, 327 (2d Dep't 1997).  Here, the last examinations conducted by Dr. Koharskyy, Dr. Abramov, and Dr. Macagno took place in September 2018, December 2018, and February 2019, respectively -- the most recent of which occurred over three-and-a-half years before defendants filed their summary judgment motion.  Koharskyy Aff. ¶ 17; Abramov Aff. ¶ 21; Macagno Aff. ¶ 6. Plaintiff therefore cannot meet his burden by utilizing those reports.

Third, as with plaintiff's permanent consequential limitation claim, Dr. Gerling's report fails to indicate the objective basis for his conclusion that plaintiff's current physical limitations and pain are attributable to his accident and did not instead evolve over time without any relationship to the accident.  See,

-37-

e.g., <u>Arroyo</u>, 85 A.D.3d at 680; <u>Perpall</u>, 2017 WL 1155764, at *20;
<u>Francis</u>, 302 A.D.2d at 425; <u>Ifrach</u>, 306 A.D.2d at 381.

### d. 90/180

Last, plaintiff does not meet his burden on the 90/180
category.  A "serious injury" under the "90/180" category requires
a showing that a plaintiff was "unable to perform <u>substantially</u>
all of her daily activities for not less than 90 of the 180 days
immediately following the accident."  <u>Rivera</u>, 2012 WL 3132667,
at *12 (emphasis added).  Plaintiff "must 'submit medical evidence
based on objective medical findings of a medically determined
injury or impairment of a nonpermanent nature which caused the
alleged limitations' on h[is] daily activities."  <u>Booth v.
Melville</u>, No. 14-cv-7022 (CM), 2015 WL 7730931, at *12 (S.D.N.Y.
Nov. 24, 2015) (first quoting <u>Dabiere v. Yager</u>, 297 A.D.2d 831,
832 (3d Dep't 2002), and then quoting <u>Licari</u>, 57 N.Y.2d at 235)
(internal quotation marks omitted).  "Self-serving statements by
a plaintiff are insufficient to establish a serious injury under
the 90/180 category."  <u>Rivera</u>, 2012 WL 3132667, at *12.

Plaintiff submits blanket denials of his own employers' work
records in his 56.1 Counter Statement, <u>see</u> Pl. 56.1 ¶¶ 33-44, but
provides no objective evidence that those records -- which reflect
a staggering number of hours worked -- are incorrect.  <u>See</u> CBS
Employment Records.  Welch also cannot deny his own deposition

statements in which he admits that he did not miss any work at CBS Studios. Welch Tr. at 73-77. The only limitations plaintiff presents are those described in his affidavit, see Welch Aff. ¶¶ 4, 9, and such "self-serving statements" alone are again wholly insufficient to establish an issue of fact. Rivera, 2012 WL 3132667, at *12; accord Lemieux, 209 A.D.3d at 1101. And to the extent that plaintiff argues that his inability "to do yard work, . . . play football, go to the gym, or lift weights," Welch Aff. ¶ 9, can substantiate his 90/180 serious injury claim, "[c]urtailment of recreational and household activities and an inability to lift heavy packages is insufficient" alone to establish serious injury under the 90/180 category. Omar v. Goodman, 295 A.D.2d 413, 414 (2d Dep't 2002). Last, plaintiff's current condition is irrelevant to the temporal requirement of the 90/180 category, i.e., whether he was unable to carry out his normal and customary activities during the 180-day period immediately following the accident. See Peplow v. Murat, 304 A.D.2d 633, 633 (2d Dep't 2003).

Defendants are thus entitled to summary judgment with respect to each serious injury category advanced by plaintiff.[22]

---

[22] Defendants also argue that plaintiff did not suffer a serious injury under the "fracture" and "significant disfigurement" categories. See Defs. Br. at 18; Defs. Reply at 10. We do not understand plaintiff to allege that he suffered from a serious injury under those two categories, but for the avoidance of doubt, plaintiff has not put forth any argument that he suffered a fracture or

**CONCLUSION**

For the reasons set forth above, defendant's motion for summary judgment is granted. In sum: (i) the physical circumstances of the accident and plaintiff's conduct thereafter refutes any link between the accident and his claimed serious injuries; (ii) the medical affirmations put forth by the parties' doctors establish that the conditions for which plaintiff holds defendants responsible are degenerative, longstanding, and predate the accident; and (iii) no reasonable jury could conclude that any injuries plaintiff sustained from the accident qualify as serious injuries.

The Clerk of the Court is respectfully directed to close the motion pending at ECF No. 41, enter judgment for defendants, and close the case.

**SO ORDERED.**

Dated:   New York, New York
         August 22, 2023

         _____
              NAOMI REICE BUCHWALD
         UNITED STATES DISTRICT JUDGE

---

significant disfigurement, and defendants are therefore entitled to summary judgment on both categories.